**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DOREEN GAGE,                           :
                                       :
              Plaintiff,               :    CIVIL ACTION
       v.                              :
                                       :    No. 11-CV-01837
                                       :
AETNA LIFE INSURANCE                   :
COMPANY, et al.,                       :
                                       :
              Defendants.              :


**MEMORANDUM AND ORDER**

Joyner, C.J.                                       June 5, 2012

       Before this Court are Defendant/Counter Claimant Long Term
Disability Income Plan for Choices Eligible Employees of Johnson
& Johnson's ("LTD Plan") Motion for Summary Judgment (Doc. Nos.
17-19), Plaintiff/ Counter Defendant's Response in opposition
thereto (Doc. No. 23), and Defendant/Counter Claimant's Reply
(Doc. No. 24). For the reasons set forth in this Memorandum, the
Court grants the Motion for Summary Judgment and enters judgment
in favor of Defendant/Counter Claimant LTD Plan.

**FACTUAL BACKGROUND**

       Plaintiff Doreen Gage worked for Johnson & Johnson as a
Process Quality Analyst. As an employee, she participated in the
Johnson & Johnson Long Term Disability Plan (hereinafter "LTD
Plan"), which is funded entirely by employee contributions. The
parties agree that the LTD Plan is an "employee welfare benefit

1

plan" within the meaning of §3(1) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002(1)("ERISA"). Defendant LTD Plan grants discretion to the Johnson & Johnson Pension Committee ("Pension Committee") to serve as plan administrator and make all final benefit determinations. Administrative Record ("A.R.") 1051-52. At the time relevant to this litigation, the LTD Plan retained the Reed Group ("Reed") to facilitate the claims administration process.

Plaintiff's history of disability benefits is complicated as her health conditions resulted from her involvement in three separate motor vehicle accidents. On March 26, 2007, Plaintiff's car was rear-ended on the highway. After this accident, she took an extended absence from her position at Johnson & Johnson while seeking treatment for neck and lower back injuries. She began receiving short term disability benefits on April 13, 2007. A.R.25. Dr. Ashok Thanki, a neurological surgeon, performed an independent medical evaluation of Plaintiff on September 24, 2007 and determined that Plaintiff was not able to fully perform her job functions at that time. Dr. Thanki felt Plaintiff's inability to work was temporary, but couldn't propose a specific date of return to work. A.R.838. Based on this evaluation, Plaintiff was approved for long term disability benefits on October 17, 2007. A.R.54.

Approximately a year later and while still on disability

leave, Plaintiff was involved in another rear-end automobile collision on March 24, 2008. Following this accident, she complained of an increase in her prior neck and back pain, and newly developed occipital headaches. Plaintiff continued to receive LTD benefits.

On September 3, 2008, June Lewandowski, a physical therapist, conducted a Functional Capacity Evaluation ("FCE") and determined that Plaintiff was able to perform the tasks required in a light duty occupation. A.R.652-57. However, shortly afterward, on September 15, 2008, Plaintiff was involved in a third motor vehicle accident. This time Plaintiff's car was reportedly struck in the aftermath of a collision between two other cars at an intersection. On the date of the accident, Plaintiff was taken to the emergency room, where they performed a lumbar spine x-ray, which was documented as normal, and brain and cervical CT scans, which showed no evidence of acute intracranial hemorrhage or mass effect, or of acute fracture or listhesis in the cervical spine. A.R.148. There did appear to be a moderate disc bulge at C5-6. A.R.994. Plaintiff was diagnosed with cervical and lumbar strain, discharged home and prescribed pain medication. A.R.68. This most recent accident prompted further review of Plaintiff's health conditions and her continued eligibility for LTD benefits.

Since the initial accident in March 2007, Plaintiff has undergone various forms of treatments for her neck and back injuries, including chiropractic care, epidural steroid injections, prescribed pain medications, acupuncture, and physical therapy. She has been examined by an array of providers in an array of medical specialties. She has likewise undergone examinations and treatments for her mental and behavioral health issues. Rather than relay Plaintiff's extensive medical records in great detail, we confine our review, and thus this case history, to the relevant issue before us: Plaintiff's disability status as of September 15, 2009. At that point, all agree that Plaintiff had been receiving disability benefits for longer than twelve months, and by the LTD Plan's terms, would only qualify for further benefits if she remained unable to perform any job that she was already, or could reasonably become, qualified to perform with or without reasonable accommodations.[1] The LTD Plan

---

[1] The LTD Plan defined "total disability," for periods of disability beginning on or after July 1, 2004, to mean:

(a) during the Elimination Period, the complete inability of the Participant, due to Sickness or Injury, to perform the Essential Functions of his or her Regular Occupation, with or without reasonable accommodation, AND

(b) during the portion of any period of disability not exceeding 12 months, following the duration of the Elimination Period, the complete inability of the Participant due to Sickness or Injury, to perform the Essential Functions of his or her Regular Occupation, AND

(c) during the remainder, if any, or the period of disability, the complete inability of the Participant, due to Sickness or Injury, to perform *any job* for which the Participant is (or may reasonably become) with or without reasonable accommodation qualified by training, education or experience. A.R.1034.

determined that Plaintiff no longer met this definition and accordingly denied her LTD benefits; Plaintiff has continued to challenge this decision through administrative appeals and now this civil action.

***Plaintiff's Medical History Following Third Car Accident***

Shortly after the third car accident, on October 1, 2008, Dr. Alexander Pendino, a neurologist, conducted an independent medical evaluation of Plaintiff. Dr. Pendino felt that Plaintiff was not capable of returning to work on either a part-time or full-time basis given the recent trauma, which had re-aggravated Plaintiff's underlying myofacscial injury. A.R.70. Dr. Pendino diagnosed Plaintiff as having cervical strain/sprain, lumbar strain/sprain, thoracic strain/sprain, post-reactive anxiety and depression, and chronic narcotic dependency. A.R.140. But, he further stated that Plaintiff's neurological status was "stable without discrete upper or lower motor neuron dysfunction" and that he saw "no discrete evidence of cervical or lumbar radiculopathy by clinical neurological examination." A.R.148-49. Dr. Pendino determined Plaintiff should continue physical therapy three times per week for six weeks, at which time she would "be able to reenter the work force on a part-time basis in her previous occupation three hours per day for a week and increasing to a full eight hour workday over a three week period." A.R.70.

Around the same time, Plaintiff sought an evaluation from

5

Dr. Adam Sackstein. Dr. Sackstein did not identify any objective focal neurological deficits during the physical examination, however, recommended diagnostic radiological studies and an extensive course of spine injection procedures. A.R.231-34. Plaintiff subsequently underwent a series of trigger point and occipital nerve injections from November 2008 until February 2009. She continued to see Dr. Sackstein for cervical and lumbar facet injections, as well as epidural steroid injections at times, on a regular basis throughout 2009. A.R.199-230.

On January 15, 2009, Dr. Barbara Baer, a neuropsychologist, conducted an independent medical evaluation of Plaintiff. Dr. Baer agreed that Plaintiff suffered from major depressive disorder- moderate without psychotic symptoms, and as a result experienced reduced speed on cognitive tasks, fatigue, poor appetite, poor sleep and weight loss. A.R.268-75. Dr. Baer indicated that Plaintiff did not have a functional impairment that would prevent her from working in any capacity from a neuropsychological perspective. Plaintiff was able to return to work on a part-time basis, four hours per day, although her cognitive efficiency should be re-evaluated after six months. At the time of Dr. Baer's evaluation, Plaintiff had been involved in ongoing psychotherapy with Dr. Lee Picariello, a licensed psychologist, and Lynne Taylor, a licensed professional counselor and biofeedback therapist, since October 2008. Dr. Baer also

6

recommended a psychiatric evaluation for medication management.

On February 27, 2009, Dr. Picarello and Ms. Taylor agreed with the conclusion that Plaintiff would benefit from a psychiatric evaluation. They reported that Plaintiff suffered from major depressive disorder—single episode severe, accompanied by severe headaches and pain in her neck, back and eyes. Plaintiff cried frequently in sessions, struggled to control her emotions and to manage daily activities, and experienced cognitive difficulties. They also concluded that "in [their] opinion, to a reasonable degree of psychological certainty, [Plaintiff] [was] severely emotionally impaired and not able to return to work in the foreseeable future." A.R.258.

Dr. Thomas Bills, who appears to be an orthopedic surgeon, examined Plaintiff on March 13, 2009. Dr. Bills noted that Plaintiff had a full range of motion of her thoracic and lumbar spine, shoulders, elbows, wrists, hips, knees and ankles. A.R.238-40. Dr. Bills detected no paraveretebral spasms in her spine or atrophy in her extremities. Dr. Bills analyzed CAT scans of Plaintiff's lumbar spine, which was negative, and her cervical spine, which showed a bulging disc at C5-6. He concluded that Plaintiff cervical, thoracic, and lumbar strains with a left sided cervical and lumbar radiculopathy. A.R.138.

On May 21, 2009, Plaintiff underwent a psychiatric evaluation with Dr. Harry Zall, who indicated that after the

third motor vehicle accident Plaintiff demonstrated significant declines in her emotional stability, including symptoms of depression and acute anxiety. A.R.551-53. She was diagnosed with a major depressive disorder and an anxiety disorder, and prescribed an antidepressant medication.

Then, on July 30, 2009, Dr. Kenneth Kutner conducted a neuropsychological evaluation of Plaintiff and concluded that she did not suffer from a neuropsychological condition that would prevent her from working. A.R.530-38. Before reaching this conclusion, Dr. Kutner performed neuropsychological testing, determined there was no evidence of any significant cognitive impairment, and diagnosed Plaintiff with major depressive disorder in partial remission and panic disorder in partial remission. A.R.141. Dr. Kutner felt Plaintiff was able to work an eight-hour day because her cognitive capacity was intact and, "while presenting features of depression, she did not manifest psychomotor retardation, severe depression, or social withdrawal." A.R.537.

### First Appeal

Based on the results of these medical evaluations, Reed determined that Plaintiff no longer qualified for LTD Plan benefits as of September 15, 2009, and advised Plaintiff of this in a letter dated August 6, 2009. Plaintiff appealed this determination. A.R.198. In support of this appeal, Plaintiff

8

submitted a copy of a report from her treating physician, Dr. William Bonner, as well as the deposition summary taken on August 5, 2009.

Dr. Bonner had reviewed the evaluation completed by Dr. Kutner, and submitted a short note concluding that he was "of the opinion within a reasonable degree of medical certainty that [Plaintiff] was not able to return to her place of employment." A.R.150. Dr. Picariello, Plaintiff's treating psychologist, indicated in a progress note dated September 25, 2009 that Plaintiff appeared lethargic during sessions, continued to reveal feelings of helplessness and hopelessness, and was working on coping with areas of life that exacerbated her stress and pain. A.R.156. Dr. Picariello indicated that Plaintiff was still receiving psychotherapy, continued to have "a great deal of difficulty controlling her emotions and struggle[d] to complete her activities of daily living without having to take frequent breaks." A.R.998.

The record also contains a handwritten, unsigned note dated September 18, 2009 that is difficult to discern. A.R.191-93. Plaintiff alleges, and for our current purposes we accept, that it was written by her treating psychiatrist, Dr. Zall. Dr. Zall noted his adjustment of Plaintiff's psychiatric medication. He also stated that Plaintiff's

> psychiatric ongoing symptoms seemed to have partially diminished
> in severity...However, her pain remains substantial and its

9

> intensification on and off triggers emotional distress. I believe
> that her returning to work at this time would have associated
> high probability of exacerbating her physical and emotional
> distress. She requires additional time in order to improve the
> chances of making a return to work successful.

Dr. Zall did not provide any proposed timeframe for Plaintiff's

potential return to work after psychiatric treatment.

Following Plaintiff's appeal, Dr. Annette Swain, a clinical

neuropsychologist, conducted an independent review of all of

Plaintiff's medical records. A.R.136-144. Dr. Swain concluded

that Plaintiff had "no significant cognitive limitations or

impairments, as documented in both of [the] neuropsychological

evaluations." A.R.143. Agreeing with Dr. Kutner's assessment, Dr.

Swain opined that Plaintiff did not warrant any restrictions in

her work or occupation from a neuropsychological standpoint. Id.

At the same time, Dr. Phillip Marion, a physician board

certified in physical medicine and rehabilitation, independently

reviewed Plaintiff's medical records from a physical

rehabilitation and pain management perspective. He determined:

> Extensive radiological studies including brain, cervical,
> thoracic and lumbar MRI scans, cervical and brain CT scans, and
> multiple x-rays have not demonstrated any significant pathology.
> Contrary to the assessment of Dr. Bonner, there is no evidence of
> significant herniated disc disease, spinal stenosis or nerve root
> impingement. In addition, physical examination consistently
> documents a normal neurological examination, specifically no
> evidence of focal motor or neurological deficits and a
> consistently documented normal gait...[Plaintiff] is independent
> with activities of daily living and fully ambulatory... A.R.152.

Dr. Marion concluded that Plaintiff was "able to work without

restriction at any occupation as of September 15, 2009 forward."

10

A.R.145-53. Accordingly, on November 11, 2009, Reed denied Plaintiff's appeal.

While her appeal was pending, Plaintiff saw Dr. John Tydings, a spine surgeon, on October 20, 2009 for a surgical evaluation, which then led to further diagnostic studies including a CT scan, myelogram and discogram. A.R.971-76. The post-myelogram CT scan report revealed congenital fusion at C2-3, focal left lateral disc protusion at C5-6 without significant foraminal impingement, and central and right paracentral disc protrusion at C6-7 with minimal compression of the spinal cord. A.R.998. In a follow-up visit on December 17, 2009, Dr. Tydings reviewed the results with Plaintiff. While there was "no discrete herniation of C4-C5," there was some "concordant pain at C4-C5" during the discogram. Thus, Dr. Tydings offered Plaintiff the option of surgery, specifically an anterior discectomy and fusion. A.R.968.

***Second Appeal***

On January 9, 2010, Plaintiff filed a second appeal, seeking a review of the November 2009 decision regarding the denial of her disability. A.R.97. Around that same time, she informed Reed that she was undergoing surgery in February. In a January 14, 2010 letter to Plaintiff, Reed explained that the appeal was under consideration and that she had the right and responsibility to furnish any additional supporting medical information relevant

to her claim for long term disability benefits. A.R.96. The letter explicitly informed Plaintiff that any pertinent information must be received by January 28, 2010 in order to be considered as a part of the appeal; the letter also provided contact information for questions regarding appeal rights.

On February 9, 2010, Plaintiff submitted additional medical information to Reed, including pre-operative notes and laboratory studies from Dr. Tydings for her scheduled surgery as well as a second opinion regarding the necessity for surgery. A.R.983-88. Dr. Mark McLaughlin, the neurosurgeon who provided this second opinion, noted that the planned surgery was merely one approach to Plaintiff's condition and that others would take a more conservative approach, such as medical pain management. A.R.1020. Plaintiff underwent surgery on February 10, 2010; she later reported an improvement in her condition.

Dr. Kevin Trangle, a physician board certified in internal medicine and certified as an independent medical examiner and medical review officer, examined Plaintiff's medical records pursuant to her second appeal. A.R.990-1005. On March 10, 2010, Dr. Trangle concluded:

> [Plaintiff's] objective findings on examination, and by imaging studies, which have been numerous indeed, do not support diagnoses for her neck or back for any substantial underlying disease such as a disc herniation, nerve root impingement, nerve root compression, foraminal stenosis or radiculopathy. From a physical perspective, I do not find any evidence that would support her being unable to work in her prior job, let alone in any of several types of sedentary and light duty jobs.

Dr. Trangle also concluded that there did "not appear to be any psychiatric or psychologic reasons that [Plaintiff] [was] unable to work in any position for which she is qualified by reason of training, education, experience and with or without reasonable accommodation." A.R.1005.

Although the review of Plaintiff's disability claim was based on her condition as of September 15, 2009, the date of termination of her LTD benefits, the Pension Committee specifically requested that Dr. Trangle opine on the cervical fusion surgery conducted by Dr. Tydings. According to Dr. Trangle, Plaintiff was "certainly capable of sedentary work and some light physical work prior to the surgery performed on February 10, 2010 by Dr. Tydings, based upon the specific articulated objective clinical evidence in the Record." A.R.1024.

The Pension Committee denied Plaintiff's second appeal on April 19, 2010. A.R.1013-1025. Based on the medical records and evaluations in Plaintiff's file, the Pension Committee concluded that there would be objective indications of neurologic deficits found in the multiple examinations and scans performed on Plaintiff if her musculoskeletal symptoms were disabling to level of impeding her ability to work in any occupation. A.R.1024. Furthermore, if Plaintiff's depression and anxiety were disabling to the degree that she could not perform any occupation, then there would be evidence of cognitive impairment on

13

neuropsychological testing and/or an inability to interact with others in the work place. A.R.1024. The Pension Committee acknowledged that Plaintiff suffered from low back/neck pain and mental health issues, but determined that there was no objective evidence that these conditions rendered her "totally disabled" as of September 15, 2009. Plaintiff filed the current action in our Court on March 14, 2011, seeking review of this decision.

### SSDI Overpayment

Plaintiff received LTD Plan benefits from October 2007 to September 2009. Before these benefits began, Plaintiff signed a Reimbursement Agreement providing, *inter alia*, that if she received retroactive Social Security Disability Income (SSDI) awards in connection with her disability, she was required to repay the LTD Plan any amount that would have been offset under the LTD Plan terms. A.R.847.

On April 8, 2009, the Social Security Administration (SSA) denied Plaintiff's claims for benefits. However, in November 2009, the SSA determined that Plaintiff qualified for SSDI benefits retroactive to March 24, 2008. As such, Plaintiff received SSDI benefits for the period from March 2008 through November 2009 in the amount of $18,301.07. Plaintiff has since repaid $15,000 in overpayment to the LTD Plan. A.R.104-109. In addition to filing an answer to the Complaint, the LTD Plan brought a counterclaim against Plaintiff seeking an additional

14

$3,301.07 in overpayment.

## DISCUSSION

## I. Denial of LTD Benefits as of September 15, 2009

"ERISA permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Hirsh v. Boeing Health & Welfare Benefit Plan, 719 F. Supp. 2d 508, 512 (E.D. Pa. 2010)(quoting Barinova v. ING, 363 Fed. Appx. 910, 913 (3d Cir. 2010)). When a plan document grants the administrator discretion to determine eligibility for benefits, as the LTD plan does here, we apply the "arbitrary and capricious" standard of review. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008); Miller v. Am. Airlines, Inc., 632 F.3d 837, 844 (3d Cir. 2011).[2] "[A]n administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller, 632 F.3d at 845

---

[2] Plaintiff mistakenly urges us to adopt a "sliding scale" standard of review, under which we should adjust the level of scrutiny to something other than the traditional arbitrary and capricious standard if we determine that the LTD Plan had conflicting financial incentives to deny claims or acted with particular bias in evaluating Plaintiff's claim. However, in Miller v. Am. Airlines, Inc., the Third Circuit clarified that following Glenn, "the sliding scale approach is no longer valid." 632 F.3d at 845n.3; see also Fleisher v. Std. Ins. Co., 2012 U.S. App. LEXIS 9907, 13-14 (3d Cir. May 17, 2012); Estate of Schwing v. Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009); Doroshow v. Hartford Life & Accident Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009). Recognizing that cases prior to Glenn are no longer good law to the extent that they applied the "sliding scale" approach, the Third Circuit instead employs a deferential abuse of discretion standard of review in all cases. Id. The existence of a conflict of interest does not change the standard to a more searching review. Rather, any conflicts of interest, whether procedural or structural in nature, are factors weighed in the overall assessment of whether an administrator acted arbitrarily or capriciously. Id.

(quotations and citations omitted).[3] The Third Circuit defines
"substantial evidence" as "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion." Fleisher v. Std. Ins. Co., 2012 U.S. App. LEXIS
9907, at 9-10 (3d Cir. May 17, 2012)(quoting Soubik v. Dir.,
Office of Workers' Comp. Programs, 366 F.3d 226, 233 (3d Cir.
2004)). "The scope of this review is narrow, and 'the court is
not free to substitute its own judgment for that of the
defendants in determining eligibility for plan benefits.'"
Doroshow v. Hartford Life & Accident Ins. Co., 574 F.3d 230, 234
(3d Cir. 2009)(quoting Abnathya v. Hoffman-La Roche, Inc., 2 F.3d
40, 45 (3d Cir. 1993)). Accordingly, we are limited to the
evidence that was before the administrator as it reviewed and
considered the claim. Hirsh, 719 F. Supp. 2d at 514; Mitchell v.
Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997). Whether an
administrator's decision was "arbitrary and capricious" is a
legal determination for the Court; however, "to the extent any
underlying facts of record are in dispute, Federal Rule of Civil
Procedure 56 controls." Loomis v. Life Ins. Co. of N. Am., 2011
U.S. Dist. LEXIS 66636, 10-11n.4 (E.D. Pa. June 21, 2011); see
Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir.
2006)(outlining Rule 56 standard of review).

---

[3] "In the ERISA context, the arbitrary and capricious and abuse of discretion
standards of review are essentially identical." Miller, 632 F.3d at 845n.2
(citing Howley v. Mellon Fin. Corp., 625 F.3d 788, 793n.6 (3d Cir. 2010)).

Defendants argue that the decision to terminate Miller's benefits was reasonable, supported by ample record evidence and, therefore, not arbitrary and capricious. After a careful and thorough review of the administrative record and the submissions of the parties, the Court agrees. In reaching this conclusion, we considered Plaintiff's claims that the LTD Plan operated under conflicts of interest and in a manner that demonstrated bias.

**(A) *Structural Conflict of Interest***

When the entity that funds the benefits is the same entity that evaluates the merits of a participant's claim, there is a structural conflict of interest. Pinto v. Reliance Std. Life Ins. Co., 214 F.3d 377, 383 (3d Cir. 2000). However, no such conflict exists when an employer funds a benefits plan, but an independent third party administers benefits, or when an employer creates an internal benefits committee vested with the discretion to interpret the plan and administer benefits. Id. The plan presently at issue falls into this latter category. The LTD Plan is funded by employee contributions and not by the administrator deciding the merits of claims. In fact, courts reviewing this very same LTD Plan have consistently held that it does not present a structural conflict of interest. See Wallace v. Johnson & Johnson, 585 F.3d 11, n.2 (1st Cir. 2009); Zurawel v. Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson, 2010 U.S. Dist. LEXIS 102085 (D.N.J. Sept. 27, 2010);

17

Dunn v. Reed Group, Inc., 2009 U.S. Dist. LEXIS 78857 at *25-26
(D.N.J. Sept. 2, 2009); Manning v. Johnson & Johnson Pension
Comm., 504 F. Supp. 2d 1293, 1302 (M.D. Fla. 2007).[4]

### (B) Procedural Irregularities, Bias, or Unfairness

In contrast to the structural inquiry, which "focuses on the
financial incentives created by the way the plan is organized,"
"the procedural inquiry focuses on how the administrator treated
the particular claimant." Miller, 632 F.3d at 845 (quoting Post
v. Hartford Ins. Co., 501 F.3d 154, 162 (3d Cir. 2007)). We look
for any irregularities or bias in the evaluation process that
would give us reason to doubt the administrator's fiduciary
neutrality and that would indicate that the administrator's
conclusion was arbitrary and capricious. Id. While there is no
exhaustive list, such procedural irregularities may include an
administrator reversing its position without additional medical
evidence, continuing to request further medical examination when
all reports unequivocally indicate disability, or relying heavily
on record reviews that contrast with the conclusions of medical
professionals who actually examined, tested and treated the
claimant. See Post, 501 F.3d at 165-66.

Plaintiff's accusations of bias and misconduct can be
grouped into two charges: (1) the LTD Plan engaged in "doctor-

---

[4] Defendant cited these cases in both its Motion and subsequent Reply briefs.
However, Plaintiff never mentions these cases, much less distinguishes or
discredits them.

shopping" until it found someone willing to state that Plaintiff no longer suffered from a mentally or physically disabling condition; and (2) the LTD Plan did not have Plaintiff evaluated from a psychopharmacological perspective or by a psychiatrist.

*(1) "Doctor-Shopping"*

Plaintiff appears to suggest that Defendant acted with bias or suspicious irregularity when deciding which doctors would complete independent medical evaluations of her health conditions. We disagree.

Contrary to Plaintiff's assertion that "three out of the four defense-requested medical examiners determined that Plaintiff...was unable to continue to engage in full-time employment," the record reveals that every independent medical examiner determined that Plaintiff's condition was temporary, and that, in time and with reasonable accommodation, she would be able to return to work.[5] Dr. Pendino anticipated that Plaintiff would be able to return to full-time work within ten weeks

---

[5] A "Dr. Rosenberg" apparently performed a medical evaluation of Plaintiff on February 6, 2008. This report was not included in the review, and has not been submitted as a part of the record before this Court. But, contrary to Plaintiff's suggestions, the inexplicable absence of this single medical evaluation has no bearing on the case. First, the LTD Plan maintains that they never requested the review by Dr. Rosenberg, and that it must have been pursuant to Plaintiff's other litigation. Def. Reply at 8. As such, Plaintiff had the burden of submitting it during the administrative proceedings regarding her LTD Plan claim, and she cannot complain about its omission having failed to do so. Second, the evaluation was completed before Plaintiff's subsequent car accidents and is thus an outdated assessment that does not relay her health condition after those traumatic events. Finally, Dr. Bonner, Plaintiff's regular treating physician whose opinion she invokes and relies upon, submitted a letter to the LTD Plan shortly afterward and stated that he disagreed with Rosenberg's assessment. A.R.147.

(around January 2009). Dr. Baer determined that Plaintiff could begin working in a part-time capacity immediately and suggested a re-evaluation of Plaintiff's cognitive capacity six months after this return. Dr. Kutner conducted this re-evaluation and felt Plaintiff could return to work in her position without restriction by September 15, 2009. And, even Dr. Thanki, who examined Plaintiff initially in 2007 after the first accident, believed that Plaintiff's condition would improve with time. There is nothing in the record to indicate Dr. Thanki's opinion on whether Plaintiff was capable of working at the time relevant to this case. It is a brazen mischaracterization of Plaintiff's medical records to suggest that any defense-requested medical examiner believed Plaintiff was totally disabled under the LTD Plan definition as of September 15, 2009. While Plaintiff did undergo multiple defense-requested medical examinations, this appears the natural result of enduring three motor vehicle accidents over a two year span, each of which Plaintiff herself claims worsened her conditions. Nothing leads us to believe that the LTD Plan kept seeking out additional reviews despite unequivocal, consistent determinations by examiners that Plaintiff was totally disabled.

Alternatively, Plaintiff argues that the LTD Plan acted suspiciously by seeking out new medical examiners rather than having the same doctors re-examine her at later dates. We review

each concern *seriatim*:

(a) Plaintiff questions why the LTD Plan did not have Dr. Thanki re-evaluate her as the defense requested medical examiner from a neurological perspective. We do not find it particularly suspicious that Dr. Thanki, who determined Plaintiff's disabling condition was temporary, was not called upon to reassess Plaintiff two years later. Plaintiff has provided no evidence to suggest that Dr. Thanki would have disagreed with the assessments made by Drs. Kutner or Baer in 2009, or that the LTD Plan deliberately chose against further evaluations with Dr. Thanki for improper reasons. Moreover, the LTD Plan accounts for this decision. The LTD Plan maintains that Dr. Thanki was no longer an "independent" examiner given that, as Plaintiff acknowledges, he served as Plaintiff's treating physician for some period of time after his initial assessment. As Defendant points out, Plaintiff was free to submit any documentation she wished from Dr. Thanki that she thought supported her claim. She did not do so.

(b) Plaintiff questions why she was not referred back to Dr. Pendino for a further independent medical examination. However, as Defendant points out, Dr. Pendino concluded that Plaintiff would be able to return to work full time in ten weeks. The Reed Group chose not to send Plaintiff back to Dr. Pendino for a second evaluation because he had previously signaled that he would give an opinion favorable to a denial of benefits, and they were concerned that Plaintiff would later claim he had preconceived notions of her abilities and was not truly independent in his second review. Rather, than signal procedural bias, Defendant appears to have acted to avoid any allegation of impropriety in the review process.

(c) Finally, Plaintiff questions why Dr. Baer was not chosen to do the follow-up neuropsychological examination. This was done, at least in part, because of an internal consistency in Dr. Baer's report. A.R. 1018. Dr. Baer stated that Plaintiff was unable to "perform an eight hour per day job in any occupation due to her depression, fatigue, chronic pain and slowed cognitive processing" at the time of the evaluation in January 2009. Id. However, Dr. Baer simultaneously stated that there were "not sufficient abnormal findings that would support a functional impairment which would prevent [Plaintiff] from working in any capacity in any occupation from a neuropsychological perspective." Id. Regardless, the conclusions of Drs. Baer and Kutner are not diametrically opposed; in fact, Dr. Baer herself predicted that Plaintiff's condition would likely improve within six months, and we see no reason to suspect that had she completed the examination of Plaintiff in July 2009 the results would have been any different.

Plaintiff provides no support in case law for her stance

that failing to utilize the same medical examiners for independent assessments of a claimant's health condition at a later date amounts to a procedural irregularity. Even if it did, we do not discern any bias or impropriety in the LTD Plan's failure to seek evaluations from the same providers continuously throughout Plaintiff's claims process. The LTD Plan has put forth a reasonable basis for why each of these providers was not summoned to re-examine Plaintiff; Plaintiff provides nothing in refutation. Although Plaintiff was given the opportunity to submit to the record, nothing in the record indicates that these providers would have, or did, determine Plaintiff met the LTD Plan definition of "totally disabled" as of September 15, 2009.

 *(2) Failure to Conduct Independent Medical Examination by Psychiatrist*

Plaintiff maintains that a psychiatrist should have been employed by the LTD Plan to evaluate Plaintiff from the psychopharmacological perspective, and suggests that the failure to do so indicates the LTD Plan's attempts to unfairly extinguish her claim. For example, Plaintiff asserts that Dr. Kutner was not capable of determining whether Plaintiff's mental state prohibited her from working an eight hour day because he is not versed in psychopharmacology.

Given that the parties acknowledge Plaintiff's history of

prescribed medications, both for pain and mental health issues, we agree that an independent medical examination by a psychiatrist would have been helpful in supplementing the record, and certainly a diligent move. However, it is not evident to us that requesting this precise evaluation was necessary to assess Plaintiff's psychological disability. Its absence does not amount to a procedural irregularity that gives rise to an inference of bias or unfairness on the part of the Defendant. The LTD Plan consistently sought evaluations of Plaintiff's mental health conditions. Plaintiff has provided us with no reason, other than her own baseless conclusion, to believe that the multiple neuropsychologists who evaluated Plaintiff and reviewed her medical history were incapable of adequately assessing whether her depression and anxiety rendered her totally disabled.

### (C) Substantial Evidence

The record reveals that Defendants relied upon substantial evidence when determining that Plaintiff could return to work and thus denied her further benefits. In particular, Drs. Pendino, Baer, and Kutner examined Plaintiff and reported that she would be capable of returning to work in some capacity by September 15, 2009. In fact, their reports suggest that she could have returned earlier than that date with accommodations. Drs. Swain, Marion, and Trangle reviewed Plaintiff's complete

23

medical history and each independently affirmed this
conclusion. The Pension Committee considered both Plaintiff's
psychological and physical conditions, and based on the
voluminous medical records, determined that these
conditions—acting alone or in concert—did not render Plaintiff
totally disabled under the LTD Plan's definition.

Rather than protest the existence of this evidence or
argue that it was not substantial, Plaintiff simply points out
alternative, contradictory evidence in the record. But this
attempt to misdirect the Court's proper focus fails. Showing
that plan administrators could have reached a different
conclusion is not enough to demonstrate that the conclusion
they did reach was arbitrary or capricious. While plan
administrators cannot arbitrarily refuse to credit a claimant's
reliable evidence, including the opinions of a treating
physician, plan administrators are not required to accord the
opinions of treating physicians any special deference. Black &
Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).
Furthermore, courts may not "impose on plan administrators a
discrete burden of explanation when they credit reliable
evidence that conflicts with a treating physician's
evaluation." Id.; Stratton v. E.I. DuPont de Nemours & Co., 363
F.3d 250, 258 (3d Cir. 2004)("A professional disagreement does
not amount to an arbitrary refusal to credit"). Finally, "the

mere existence of contradictory evidence [does] not, in itself, make the administrator's decision arbitrary." Grossman v. Wachovia Corp., 2005 U.S. Dist. LEXIS 21659, *35-36 (E.D. Pa. Sept. 27, 2005)(quoting Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001)). Rather, "[i]t is the role of the Administrator to weigh conflicting evidence." Id.

Plaintiff also complains that the administrator failed to consider Plaintiff's eventual approval for SSDI benefits. While the Court may consider the SSA's decision as a factor in evaluating whether the LTD Plan's denial of benefits was arbitrary and capricious, "a Social Security award does not in itself indicate that an administrator's decision was arbitrary and capricious, and a plan administrator is not bound by the SSA decision." Marciniak v. Prudential Fin. Ins. Co. of Am., 184 Fed. Appx. 266, 269 (3d Cir. 2006).

The Pension Committee's determination that Plaintiff was not "totally disabled" after September 15, 2009 was neither arbitrary nor capricious. Accordingly, we find that the Defendant did not abuse its discretion when it denied Plaintiff LTD benefits.

## II. Overpayment of LTD Benefits

Plaintiff agrees that the LTD Plan provides that SSDI benefits are to be offset against any required LTD payment. She also recognizes that there was an overpayment and states that

she repaid $15,000 to the LTD Plan. Although Plaintiff acknowledges that the LTD Plan is entitled to any overpayment, Plaintiff asserts that the LTD Plan has not provided adequate proof or evidence that an additional $3301.07 remains due, and thus has not met its burden on the counterclaim. We disagree.

Plaintiff never filed an answer to this counterclaim, and never denied any of the allegations contained therein. Each of these allegations is therefore admitted against her. See Fed. R. Civ. P. 8(b)(6). By her own failure to act, Plaintiff has acknowledged the remaining debt owed to the LTD Plan. Even if this were not the case, the record supports the LTD Plan's claim for $3,301.07 in additional overpayment due. See A.R.104-109. Accordingly, we award Defendant LTD Plan the remaining overpayment balance as well as accrued interest.

### CONCLUSION

Plaintiff has not made a sufficient showing to sustain her charges that the LTD Plan acted arbitrarily or capriciously with regard to her claim for LTD benefits on and after September 15, 2009. She has also failed to sufficiently defend against the LTD Plan's counterclaim to collect the remaining overpayments owed by Plaintiff to the LTD Plan. Accordingly, we grant Defendant/ Counter Claimant's Motion for Summary Judgment. An order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
DOREEN GAGE,                       :
            Plaintiff,             :    CIVIL ACTION
    v.                             :
                                   :    No. 11-CV-01837
                                   :
AETNA LIFE INSURANCE               :
COMPANY, et al.,                   :
            Defendants.            :
```

**ORDER**

AND NOW, this   5th   day of June, 2012, upon
consideration of Defendant/Counter Claimant Long Term
Disability Income Plan for Choices Eligible Employees of
Johnson & Johnson's ("LTD Plan") Motion for Summary Judgment
(Doc. No. 17), Plaintiff/ Counter Defendant's Response in
opposition thereto (Doc. No. 23), and Defendant/Counter
Claimant's Reply (Doc. No. 24), and for the reasons set forth
in the accompanying Memorandum, it is hereby ORDERED that the
Motion is GRANTED and judgment is entered in favor of
Defendant/Counter Claimant LTD and against Plaintiff/Counter
Defendant Doreen Gage, in the amount of $3,301.07.[6] The Clerk
is DIRECTED to mark this case closed.

                              BY THE COURT:


                              s/J. Curtis Joyner
                              _____

_____

[6] Defendant may submit documentation of accrued interest on this judgment, and
attorney fees and costs, to the Court.

27

J. CURTIS JOYNER, C.J.